

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-0144-10

**ANTHONY G. HEREFORD, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

### ON STATE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE SEVENTH COURT OF APPEALS
### LUBBOCK COUNTY

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, KEASLER, HERVEY, and COCHRAN, JJ., joined. WOMACK, J., concurred. KELLER, P.J., dissented.

### O P I N I O N

Appellant was arrested for misdemeanor traffic warrants. After the police placed appellant in the back of the police car, officers noticed that he was hiding something that they assumed was cocaine in his mouth. Officers were able to remove crack cocaine from appellant's mouth and hand after repeated use of Tasers and with the assistance of medical personnel. Appellant was charged with possession of a controlled substance with intent to deliver: cocaine. Appellant filed a motion to suppress the evidence based on his claims that the officers lacked probable cause to arrest him and

used unreasonable force to recover the drugs he held. The trial court denied appellant's motion because the arrest of appellant was based on existing arrest warrants. During the guilt phase of trial, appellant renewed his suppression motion and objected to the admission of all of the state's evidence derived from the officers' actions. The trial court again denied appellant's motion, but granted appellant's running objection. The jury found appellant guilty of the offense charged and assessed appellant's punishment at 50 years' imprisonment and a $10,000 fine.

The Seventh Court of Appeals reversed appellant's conviction and remanded the cause for a new trial.[1] In its ruling, the court found that, given the totality of the circumstances, the force used by the officers to recover the drugs was excessive and unreasonable and held that the trial court had erred in denying appellant's motion to suppress, an error deemed harmful because it affected the outcome of the trial. This Court granted the state's petition for discretionary review[2] to determine whether the court of appeals erred in reversing the trial court's denial of the motion to suppress and whether the repeated use of a Taser "to prevent a potentially fatal overdose" is inherently excessive and unreasonable. The state asserts that the latter is "an important issue of state or federal law that has not been, but should be, settled by the Court of Criminal Appeals,"[3] and therefore warrants consideration by this Court.

---

[1] *Hereford v. State*, 302 S.W.3d 903 (Tex. App.— Amarillo 2009, pet. granted).

[2] The 3 grounds granted review are:
  1. Did the court of appeals give due deference to the trial judge's witness-credibility determinations when it decided that the trial court erred in denying the motion to suppress based on a claim of an unreasonable search and seizure due to the manner in which the evidence was obtained?
  2. Did the court of appeals err in finding that the trial court should have granted the motion to suppress on the basis that excessive and unreasonable force was employed by the police officers when the officers used a taser on a suspect to get the suspect to remove narcotics from his mouth in order to prevent a potentially fatal overdose?
  3. Is the use of a taser, even repeatedly, to prevent a potentially fatal overdose inherently excessive and unreasonable as a matter of law?

[3] Tex. R. App. P. 66.3(f).

In its petition for discretionary review, the state argues that the court of appeals failed to give proper deference to the trial court's implied findings of fact when the court of appeals reviewed the force used—specifically as it related to the frequency, duration, and location of the use of the Taser at the hospital. The state submits that the court of appeals instead reviewed both the historical facts and the application of the law *de novo* and asserts that, given the historical facts implicitly found by the trial judge and the officers' lack of reasonable alternatives in the situation, the force used to obtain the evidence was not excessive and unreasonable. The state concludes that the denial of the motion to suppress should have been affirmed by the court of appeals.

Appellant counters that the court of appeals did not ignore or reverse any facts implied by the trial court, nor did it find any facts of its own; the court of appeals simply stated the range of possibilities reflected by the evidence, applied the proper constitutional analysis of the law of search and seizure, and correctly found that, under the facts of this particular case, appellant's Fourth Amendment interest to be free from unreasonable seizure outweighed the state's interest in preservation of evidence and prosecution of the alleged crime. Appellant concludes that the court of appeals did not deviate from the law and its judgment should be upheld.

After review, we find that the court of appeals properly deferred to the trial court when the trial court's findings were supported by the record. We affirm the judgment of the court of appeals and its finding that the force used to seize evidence in this case was excessive and, therefore, unreasonable.

**Motion to Suppress**

At appellant's suppression hearing, Officer Williams testified that he saw appellant drive into the Carriage House Motel parking lot in Lubbock and get out of his car. The motel was known by

the officers for its drug activity. Officer Williams recognized appellant from prior interactions, including an incident the week before, during which appellant had refused to pull his car over at the officer's command. Knowing that appellant had valid Class C traffic warrants, Officer Williams approached appellant, patted him down, checked his pockets, and arrested him. During this encounter, Officer Williams had a conversation with appellant and told him that he was under arrest for outstanding warrants, but he did not notice any drugs on appellant or in appellant's mouth during this pat down and discussion. Officer Williams handcuffed appellant's arms behind his back and placed him in the back seat of the squad car. Corporal Holmes arrived with his drug dog, Nexo, and conducted a search of appellant's car for the scent of narcotics. Based on Nexo's alert, officers manually searched appellant's car, but failed to find any drugs. Officer Williams returned to his police car and noticed that appellant had his head down and was chewing on something. Officer Williams commanded appellant to open his mouth and spit it out, but appellant refused. Officer Flores, Corporal Holmes, and Officer Williams forcibly removed appellant from the back seat of the police car and pushed him, face down, onto the trunk of the squad car. While the officers were removing appellant from the car, Officer Williams "drive stunned"[4] him on the leg, a method the officer described as "pain compliance."

Assuming that appellant's mouth contained crack cocaine, Officer Williams then grasped appellant "pretty sternly" around the throat to prevent appellant from swallowing and shook him in an effort to get him to open his mouth. When appellant still did not comply, Officer Williams attempted to tase appellant again, but the Taser did not connect because appellant was being pushed

---

[4] In a "drive stun" the officer removes the wire firing cartridge, places the Taser gun directly against the target's body, and pulls the trigger to give a jolt of electricity to a concentrated area of the body. II R.R. at 17.

to the ground. While appellant was on the ground, Officer Williams successfully tased appellant in the back.

Officer Flores lifted appellant off the ground and pinned him to the trunk of the car while Officer Williams threatened to tase him again. While pinned, appellant moved around and attempted to push off of the car, but was forcefully held down by the officers. When appellant still refused to open his mouth, the officers chose to discontinue use of physical force and returned appellant to the back seat of the car. After discussing their options for 15 to 20 minutes, the officers took appellant to University Medical Center (UMC) hospital to seek medical assistance. Officer Williams admitted that this lack of urgency was in accordance with his belief that appellant was only holding the crack cocaine in his mouth rather than swallowing it. Officer Williams further stated that he was aware that crack cocaine would not dissolve in appellant's mouth.

Appellant rocked back and forth, screamed, mumbled, moaned, and made noises during the drive to the hospital, behavior which Officer Williams testified is consistent with someone under the influence of narcotics.[5] Appellant also banged his head against the guard shield of the police car several times.

At the hospital, Officer Williams turned appellant over to Officer Arp, who was off-duty and working as security at UMC. The medical staff unsuccessfully attempted to get appellant to open his mouth by using ammonia capsules. When the ammonia did not work, Officer Arp used his Taser in an attempt to get appellant to expel the contents of his mouth. Officer Williams testified that, during this process, he was in and out of the medical examining room and was unaware of how many times or where Officer Arp tased appellant. He could hear appellant screaming in the examining

_____

[5] It is also consistent with someone who is in pain.

room, but appellant had been making noises the entire time he was at UMC. Officer Williams also testified that appellant was not a danger to any of the officers or medical staff and that swallowing the cocaine was no longer a concern because medical staff would then have pumped appellant's stomach.

Appellant called Officer Arp to testify about his actions. Officer Arp testified that appellant was brought to the hospital in handcuffs, reportedly as a combative arrestee. After he spoke with Officer Williams about the situation, including Officer Williams's previous use of his Taser, Officer Arp took appellant to an examining room, where medical personnel attempted to assess appellant's health and to extract the contents of his mouth. Officer Arp did not know what was in appellant's mouth, but he speculated that appellant was holding crack cocaine. During this process, appellant remained uncooperative. When the method used by the hospital staff proved ineffective, Officer Arp began to tase appellant.

Although his Taser log showed that his Taser had been fired eight times, including a period of roughly 20 continuous seconds, Officer Arp testified that he tased appellant only four times: three times in the upper inner thigh[6] and once in the right forearm. Officer Arp could not identify which of the Taser firings shown on the Taser log made contact with appellant, but admitted to having specifically chosen to tase appellant in the upper inner thigh—which he later affirmed was in the groin area[7]—because he knew it to be a sensitive part of the body. During these repeated tasings, appellant opened his mouth enough for medical personnel to remove small amounts of the contents,

---

[6] When asked if he tased appellant in the groin area, Officer Arp responded, "Not the groin area, the upper inner thigh. It depends on how–what you consider the groin area to be." II R.R. at 70.

[7] Subsequently, when asked if he chose to tase appellant in the "groin area" rather than the shoulder, Officer Arp responded, "Yes, ma'am." II R.R. at 78.

increasing Officer Arp's motivation to tase appellant. Eventually appellant did relinquish the contents of his mouth, which were wrapped in plastic; Officer Arp testified that there was white residue, saliva, and blood all mixed together. Officer Arp also tased appellant in the right forearm in order to retrieve the cocaine in appellant's hand. He testified, as did Officer Williams, that appellant was handcuffed and was no physical threat to him and that, although appellant's legs were not restrained, he did not kick or attempt to injure any of the medical staff.

Appellant raised the suppression issue of excessive force and the claim of a Fourth Amendment violation again at trial, and the trial court again denied the motion. We may therefore consider the trial testimony about his arrest in our analysis of this case. At trial, both Officer Williams and Arp testified in further detail about the events that occurred. Both officers also testified that, after Officer Arp tased appellant in the right forearm, appellant finally relented and voluntarily opened his mouth to spit out the remaining cocaine. Officer Williams testified that, although he never saw appellant put anything into his mouth, appellant's cheeks were obviously bulging on both sides when the officers pulled him out of the police car. During a subsequent strip search, officers found additional narcotics hidden in between appellant's buttocks. Officer Arp acknowledged that, although he wrote in his police report that Corporal Holmes tased appellant in the chest and neck while at the hospital, he may have been mistaken.

Officer Williams weighed the seized items as two separate pieces of evidence. The first piece of evidence contained a white rock-like substance and small plastic bags obtained from appellant's hand and buttocks. Officer Williams measured the net weight of this evidence at 10.4 grams. The second piece of evidence, obtained from appellant's mouth, consisted of plastic bags with rocks of cocaine inside. Officer Williams testified that the bags and rocks were red in color from blood and

weighed 7.1 grams. Both pieces of evidence were submitted to the Crime Laboratory Division of the Texas Department of Public Safety. Scott Williams, a forensic chemist employed at the laboratory, testified that the net weight of the substance found in appellant's hand and buttocks was 9.71 grams, and contained cocaine. Mr. Williams did not test or weigh the substance collected from appellant's mouth, but noted that the substance from appellant's mouth looked like the substance obtained from appellant's hand and buttocks.

Corporal Holmes testified at trial that he assisted Officer Williams with the initial search of appellant's car and the events that followed. Corporal Holmes had also grasped appellant by the throat and recalled that one of the other officers slammed appellant onto the trunk of the police car after appellant pushed off. At UMC, Corporal Holmes witnessed Officer Arp tase appellant in the "groin area," and assisted in collecting evidence from appellant's hand, but the corporal did not tase appellant himself. As did Officers Williams and Arp, he testified that, during the entire interaction, appellant was noncompliant and behaved erratically, but he did not threaten, attack, assault, or pose a danger to anyone.

## Standard of Review

In reviewing the trial court's denial of a motion to suppress, an appellate court must uphold the trial court's judgment as long as it is reasonably supported by the record and is correct under any applicable theory of law.[8] The appellate court must view the record in the light most favorable to the trial court's ruling and reverse that ruling only if it is outside the zone of reasonable

---

[8] *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

disagreement.[9]

In *Guzman*, this Court clarified the levels of deference given to the trial court's findings of fact in a motion to suppress.[10] In its review, the appellate court does not perform its own fact-finding mission, but limits the scope of its factual review to determining whether the trial court's findings were reasonable in light of the evidence presented.[11] If these findings are reasonable, the appellate court must defer to the trial court.[12]

However, as explained in *Guzman*, this standard of almost total deference applies only to findings of historical fact and "mixed questions of law and fact" that rely upon the credibility of a witness.[13] It has long been recognized that, during a hearing on a motion to suppress, the trial judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony.[14] The trial judge has the opportunity to view the demeanor of the witnesses and is therefore in a better position to make these factual determinations than appellate judges. In situations such as this, in which no findings of historical fact were made by the trial judge, the appellate court will infer factual findings implicit in the trial court's conclusion as long as the implied findings are supported by the record.[15] This is true regardless of whether the trial court has granted or denied a motion to

---

[9] *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

[10] *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997).

[11] *Romero,* 800 S.W.2d at 543.

[12] *Id*.

[13] *Guzman*, 955 S.W. 2d at 87.

[14] *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Romero*, 800 S.W.2d at 543.

[15] *State v. Garcia-Cantu*, 253 S.W. 3d 236, 241 (Tex. Crim. App. 2008); *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005).

suppress.[16]

The trial judge's comparative advantage is lesser in review of pure questions of law and in mixed questions of law and fact that do not depend on credibility determinations. Such topics might include determinations of reasonable suspicion or probable cause as well as other applications of the law of search and seizure.[17] An appellate court reviews these questions *de novo*;[18] "Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles."[19] This application requires a Fourth Amendment reasonableness review, thus, the appellate court reviews it *de novo.* [20]

### The Fourth Amendment

At one time,[21] the United States Supreme Court analyzed cases that involved the manner in which evidence is seized under a Fourteenth Amendment substantive due-process standard, but it has since recognized that seizure issues fall within the realm of the Fourth Amendment.[22] "To determine the constitutionality of a seizure '[w]e must balance the nature and the quality of the intrusion of the individual's Fourth Amendment interests against the importance of the governmental

---

[16] *Ross*, 32 S.W.3d at 856.

[17] *Guzman*, 955 S.W.2d at 87; *Dixon*, 206 S.W.3d at 590.

[18] *Johnson v. State,* 84 S.W.3d 658 (Tex. Crim. App. 2002).

[19] *Guzman*, 955 S.W.2d at 87.

[20] *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000); *Guzman*, 955 S.W. 2d at 87.

[21] *Rochin v. California*, 342 U.S. 165 (1952); *See Brown v. Mississippi*, 297 U.S. 278 (1936).

[22] *Hubert v. State*, 312 S.W.3d 554, 560 (Tex. Crim. App. 2010)*; Tennessee v. Garner*, 471 U.S. 1, 7– 8 (1985); *Winston v. Lee*, 470 U.S. 753, 759 (1985).

interests alleged to justify the intrusion.'"[23]  This weighing of the interests of the individual on the one hand and the public on the other sets the baseline for the process that is due[24] in seizures of persons or property.  Through this balancing test, the Fourth Amendment analysis measures, under the totality of the circumstances, the objective reasonableness of a seizure.[25]  This reasonableness test goes further than merely evaluating when and where a seizure is made; it also accounts for the manner in which the seizure is carried out.[26]  The objective test is applied on a case-by-case basis; no bright line determines when a governmental intrusion becomes constitutionally impermissible.[27]

On a claim of excessive force, the objectively reasonable standard ignores the underlying intent or motivation of the acting police officer.[28]  "An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."[29]  Evidence of the officer's subjective intent or motivation may be used only to assess the credibility of the officer's claims about what information was or was not available at the time of the incident in question.[30]

This inquiry must be a practical one; a police officer's decision must be made instantaneously

---

[23] *Garner*, 471 U.S. at 7 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

[24] *Gerstein v. Pugh,* 420 U.S. 103, 125 (1975).

[25] *Garner*, 471 U.S. at 8–9.

[26] *See U.S. v. Brignoni-Ponce*, 422 U.S. 873 (1975); *U.S. v. Ortiz*, 422 U.S. 891, 895 (1975).

[27] *Winston*, 470 U.S. at 760.

[28] *Whren v.* U.S., 517 U.S. 806, 814 (1996); *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Crittenden v. State*, 899 S.W.2d 668, 671 (Tex. Crim. App. 1995); *See Garcia v. State*, 827 S.W.2d 937, 941–942 (Tex. Crim. App. 1992).

[29] *Graham*, 490 U.S. at 397; *see Scott v. United States*, 436 U.S. 128, 137–139 (1978).

[30] *Garcia*, 827 S.W. 2d at 942, n.5; *Scott*, 436 U.S. at 139, n.13.

in difficult and stressful situations.[31]  Generally, officers may use only that amount of force that is necessary to effect the purpose of the stop or to overcome force used against the officer.[32]  While societal needs justify some limitations on an individual's personal interests and condone minor intrusions of privacy and security,[33] excessive encroachments are contrary to the protections afforded by the Fourth Amendment.[34]  Law enforcement may not use whatever means are available to seize evidence, regardless of reasonableness.[35]  If the means chosen are unreasonable, the evidence obtained by such means must be suppressed.[36]

Using these standards, the proper inquiry is whether, given the facts supported by the record, the force that was used to seize the evidence was objectively reasonable.

## Deference

In its first point of error, the state argues that the Seventh Court of Appeals's reasonableness analysis ignored the implied findings of fact of the trial court and that, despite the fact that the implied findings were supported by the record, the court of appeals substituted its own findings on the frequency, duration, and location of the Taser use at the hospital for those of the trial court.  The state contends that, given the trial court's denial of the motion to suppress, the trial court implicitly believed Officer Arp's testimony that he tased appellant four times rather than the eight listed on the

---

[31] *Graham,* 490 U.S. at 396–397.

[32] *Tennessee v. Garner*, 471 U.S. 1,  8 (1985); see *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997).

[33] *Winston v. Lee*, 470 U.S. 753, 755 (1985); *Schmerber v. California*, 384 U.S. 757, 772 (1966).

[34] *Garner*, 471 U.S. at 8.

[35] *Id.*

[36] *Mapp v. Ohio*, 367 U.S. 643, 655; *Ford v. State*, 538 S.W.2d 633, 635 (Tex. Crim. App. 1976).

Taser log, that the twenty seconds of continuous Taser firing was not continuously applied to appellant's skin, and that the application was to appellant's left upper inner thigh, rather than to his groin.

At the motion to suppress hearing, appellant argued that there was no probable cause to arrest appellant and that the force used to seize the evidence was unreasonable. We have reviewed the record and the court of appeals's decision, and we note that the trial court denied suppression based on the existence of warrants, but did not address appellant's excessive-force claim. The latter issue was reasserted during the state's case-in-chief, and again the trial judge denied appellant's motion without expressly addressing appellant's arguments about the unreasonableness of the force that was used. Appellant was granted a running objection for all evidence admitted as a result of the force.

As is noted by the state, the trial court made no express, written findings of fact, and neither party requested them. Therefore, the state is correct that we must presume that the trial court found facts consistent with its ruling.[37] Thus, the court of appeals, as well as this Court, must afford almost total deference to the trial court's determination of historical facts that are supported by the record.[38] The court of appeals did not cite to this standard of review or discuss implied findings.

Assuming that the trial court implicitly found that Officer Arp tased appellant only four times, regardless of what the Taser log read, at first it may appear that the court of appeals failed to accord the required degree of deference to the trial court's implied findings. This conclusion stems

---

[37] *Compare State v. Ross*, 32 S.W.3d 853, 855-56 (Tex. Crim. App. 2000) (no explicit findings of fact), *with State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006).

[38] *State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006).

from the Seventh Court of Appeals's conclusion that appellant was shocked up to eleven times,[39] including either four or eight times by Officer Arp. However, when we consider Officer Arp's testimony regarding the duration of the tasing, in conjunction with the Taser log readings about which the officer testified at the suppression hearing and at trial, it becomes evident that an implicit finding of only four tasings is not reasonably supported by the record.

Officer Arp testified that he initially fired the Taser four times for almost 20 continuous seconds, but that not all of the firings made contact with appellant's skin. A few minutes after this initial series, the Taser log shows another series of four firings separated by a few seconds each. Officer Arp testified that he may have dry-fired his Taser on the first firing, but he failed to explain the discrepancy between his testimony that he tased appellant only four times and the Taser log reading that indicated that the Taser was fired at least eight times. While a possible explanation for the variance between Officer Arp's testimony and the Taser log may be that Officer Arp was describing the repeated firings as a single "tase," that testimony cannot be reconciled with the Taser log either. Because the trial court's implied findings are not reasonably supported by the record, the court of appeals was not bound to defer to them.

The court of appeals's opinion referred to the part of the body where Officer Arp tased appellant as both the "groin area" and the "upper inner thigh." Webster's Dictionary defines the

---

[39] The possibility of eleven tasings resulted from the sum of the two uncontroverted tasings by Officer Williams, the controverted eight tasings recorded by Officer Arp's Taser, as well as Officer Arp's notation in his police report that Corporal Holmes tased appellant once. IV R.R. at 177–178. However, the record clearly states that Officer Arp was mistaken, as Corporal Holmes' taser was not functioning at the time of this incident. IV R.R. at 62. As there is no testimony that Corporal Holmes did tase appellant, we do not consider it here.

"groin" as "the fold or hollow on either side of the body where the thigh joins the abdomen."[40] While the state contends that the trial court implicitly found that the tasing occurred in the "upper inner thigh," as initially testified to by Officer Arp, the state fails to note that Arp later answered affirmatively when asked whether he chose to tase appellant in the "groin area" as opposed to somewhere closer to the shoulder[41] or that the upper inner thigh abuts the groin area. Corporal Holmes confirmed that Officer Arp tased appellant in the groin.[42] The court of appeals also noted that Officer Arp deliberately chose to tase appellant in a "sensitive area," a factor the court of appeals considered highly relevant.

In its analysis of the reasonableness of the force used to seize the narcotics, the court of appeals was not required to defer to the trial court's implicit findings of fact in regards to the frequency, duration, and location of the tasings at the hospital because they are not reasonably supported by the record. The court of appeals did mention a possible eleventh tasing—a single tasing by Corporal Holmes—however, Corporal Holmes, Officer Williams, and Officer Arp individually testified that Corporal Holmes did not tase appellant. Officer Arp admitted that he was mistaken when he included that fact in his police report. The court of appeals also asserted in its opinion that Officer Williams described seeing Officer Arp apply the Taser to appellant's "groin area," when, in fact, it was Corporal Holmes that testified that he saw Officer Arp tase appellant in the groin. We find these two discrepancies unimportant; one of the officers present at UMC testified that he

---

[40] WEBSTER'S ENCYCLOPEDIC UNABRIDGED DICTIONARY OF THE ENGLISH LANGUAGE 624 (Gramercy Books 1989). Corporal Holmes testified that his definition of "groin" is "pretty much the middle of the thighs up to lower abdomen." IV R.R. at 57.

[41] II R.R. at 78.

[42] IV R.R. at 30.

witnessed Officer Arp tase appellant in the groin, and the difference between ten and eleven tasings does not greatly affect this analysis.

The court of appeals may be seen as having failed to credit testimony that appellant was "combative" through out this incident, but this testimony was also unsupported by the record. Each officer agreed that appellant was not compliant with their orders to spit out the contents of his mouth, yet, each individually confirmed that appellant was not a danger to the officers, the medical staff, or anyone else. Officer Williams commented during direct examination that, even though appellant was handcuffed, he was still a potential threat to the welfare of the medical staff. This testimony was directly contradicted by his own testimony, during the pre-trial suppression hearing and on cross-examination at trial, that appellant was not a threat to anyone present. Corporal Holmes noted that appellant's legs were not tied down when he was strapped to a bed at UMC, but stated that appellant did not kick or injure anyone. Officer Arp testified that, although appellant's legs were not strapped down, they were held down while appellant was on the hospital bed. Appellant kicked his feet only when he was strapped to a bed while Officer Arp and the medical staff administered ammonia capsules and additional Taser shots.[43] Other than refusal to open his mouth, the only non-compliant

---

[43] The electric shock produced by the Taser when it was applied to appellant's upper inner thigh had the capability of producing an involuntary leg spasm that mimicked voluntary kicking. On cross-examination, Corporal Holmes testified that tasing will cause spasms.

> Q. So if you shot somebody with the prongs, one in one shoulder here and on in the other shoulder here, the muscle groups in between are going to–what happens to them?

> A. Generally, they'll spasm. I've been shot with a taser before, and it causes a muscle spasm. They lock up, and they quiver, and you lose control of them. You can't make them work.

> IV R.R. at 46.

Officer Williams testified on cross-examination that "jerking" occurs.

> Q. No, you said that he was jerking around a little bit when you guys were pulling him out of the

acts mentioned were that appellant did not immediately exit from the back of the police car, moved his head around, tried to push off of the trunk of the police car when his chest and head were being forced down by three officers, and that he moved around and made loud noises. Non-compliance, without more, does not itself deem a suspect "combative" in a use-of-force analysis. The court of appeals was not required to defer to the trial court's implied finding that appellant was combative when such a finding was not supported by the record.

We conclude that the court of appeals properly reviewed the evidence presented, and gave deference where the implicit findings of fact were supported by the record. We overrule ground one.

**Reasonableness**

The state contends that, upon proper application of the law of search and seizure to the historical facts, the officer's repeated use of their Tasers should not have been found unreasonable under the Fourth Amendment. The state argues that Williams used his Taser only after he realized that appellant had evidence in his mouth, that he was chewing on and attempting to swallow the suspected cocaine, and that he could suffer adverse health effects or even death. Therefore, the officers reasonably believed that the use of the Taser was necessary to get appellant to open his mouth and used a reasonable amount of force to get appellant to do so.

---

car.

A. Yes.

Q. Okay. Could he have been jerking around because he was being tased?

A. Well, he was jerking before. Of course, he could have been jerking around because he was getting tased. The taser doesn't feel good.

IV R.R. at 128.

The state's justifications run contrary to the necessary objectivity required by a Fourth Amendment reasonableness analysis. While accounting for the circumstances surrounding the officers, the objective test ignores the underlying intent or motivation for the officer's actions.[44] This Court decided in *Garcia,*[45] and affirmed in *Crittenden,*[46] that the reasonableness of an officer's actions are to be judged from the perspective of a reasonable officer in those circumstances without regard to the purported reason of the officer whose actions are being evaluated. The officer's actual intentions will neither validate nor invalidate the reasonableness of the officer's actions.

The court of appeals correctly points to the *Winston*[47] factors as the test for balancing the intrusion to the individual's personal interests, the societal need for effective law enforcement, and the state's need for evidence. These factors include whether the police conduct: 1) threatened the suspect's health or safety; 2) conformed to accepted medical practices; 3) was performed by a trained professional; 4) arose from the existence of probable cause to believe the suspect had evidence of a crime; 5) unduly intruded upon the suspect's dignity interests in personal privacy; and 6) was a commonplace procedure to which individuals are often subjected.[48]

Although the court of appeals did not conduct an evaluation of each factor of this non-exhaustive list, it pointed to a number of relevant considerations in reaching its conclusion. The court of appeals noted that the continuous application of the Taser gun may be a threat to a person's health

---

[44] *Graham v. Connor*, 490 U.S. 386, 397 (1989).

[45] *Garcia*, 827 S.W.2d at 942.

[46] *Crittenden v. State*, 899 S.W.2d 668, 672 (Tex. Crim. App. 1995).

[47] *Winston v. Lee*, 470 U.S. 753 (1985).

[48] *Id*. at 761-763.

or safety. It pointed to Officer William's acknowledgment that the drive stun is a method of "pain compliance,"[49] that Tasers have been involved in incidents in which individuals have died, and that there is always a risk of death when a Taser is used.[50] Officer William's testimony that the Taser is less violent than being struck by his asp, fist, or knees,[51] does little to counter the finding that the Taser does threaten a suspect's health or safety. Finally, the court of appeals could reasonably find that sending electrical charges through appellant's body created an unreasonable risk of harm if officers already had a concern that appellant could be experiencing an elevated heart rate due to cocaine use.[52]

The court of appeals next examined whether the repeated Taser use comported with accepted police procedure. None of the testifying officers was able to verify that the repeated use of the Taser to collect evidence followed acceptable police procedure, and the court of appeals was understandably concerned that the officers seemed unconcerned by the potential dangers of excessive tasing and appeared to believe that repeated Taser use is an acceptable practice. Perhaps even more worrisome to the court of appeals was Officer Arp's testimony that he would use the same force

---

[49] *Hereford v. State*, 302 S.W.3d 903, 909 (Tex. App.– Amarillo 2009, pet. granted).

[50] Amnesty International has found that 334 people in the United States have died after being stunned by "conducted energy devices" between June 2001 and August 31, 2008. AMNESTY INTERNATIONAL, 'LESS THAN LETHAL'? THE USE OF STUN WEAPONS IN US LAW ENFORCEMENT (2008); *see also*, Jason Trahan, *Police officer sues maker of Taser over back injuries*, AUSTIN AMERICAN-STATESMAN, Jan. 24, 2011, at B1 (police officer suffered fractured vertebrae from being shocked in training class); *see also* Robert Anglen, *Police in 5 States sue Taser in past 2 weeks*, THE ARIZONA REPUBLIC, August 20, 2005, http://www.azcentral.com/arizonarepublic/local/articles/0820taser20.html (police officers injured when shocked during training classes).

[51] II RR at 35.

[52] *See* II RR at 42; *see also* IV RR at 28.

again if confronted with a similar situation.[53]  The court described the conduct of the involved officers as a "rather cavalier attitude towards the use of a weapon known to inflict pain, cause burns, and 'always' involves the risk of death."[54]  Of significance to the court of appeals in its evaluation was Officer Williams's testimony that the officers were trained to avoid tasing suspects in certain areas of the body, including the groin area.  *Hereford*, 302 S.W.3d at 908.

While the court of appeals did not examine whether the tasing was done by trained professionals, the record reflects that the officers were trained in the use of a Taser gun and are employed in a profession in which use of this weapon may be appropriate.  Similarly, the court of appeals did not address whether the officers had probable cause to believe that appellant had evidence of a crime after the officers witnessed appellant's actions in the back of the patrol car, but this factor was not challenged by appellant.  The court of appeals recognized that appellant was under arrest when the search and seizure began and was subject to a search of his person, but found that the manner of this search and seizure was problematic.

In addressing the fifth factor, the court of appeals noted that the use of a Taser to inflict pain "falls short of establishing it is a nominal affront to human dignity and personal security," but it went on to describe the injury that can be associated with the use of the Taser.  Although none of the officers testified that a Taser had actually killed a suspect, the court of appeals asserted that, "[f]ar less is needed before a practice is considered unreasonable."[55]  This encroachment into appellant's

---

[53] IV RR at 180.

[54] *Hereford*, 302 S.W.3d at 910.

[55] *Hereford*, 302 S.W.3d at 909 (citing to *Dominguez v. Moore*, 149 Fed. Appx. 281, 283, No. 04-41382, 2005 U.S. App. LEXIS 21337 at *3 (5th Cir. 2005) (not designated for publication)).

privacy rights was exacerbated by the manner in which the officers used their weapons–as a pain-infliction device for those deemed non-compliant–as well as the cavalier attitude exhibited in their testimony. As noted by the United States Court of Appeals for the Seventh Circuit, "pain, not injury, is the barometer by which we measure claims of excessive force."[56]

In its assessment of the sixth *Winston* prong, the court of appeals concluded simply that exposure to repeated tasing is not an occurrence to which people are regularly exposed in their ordinary lives.

Appellant's interests were not the only considerations in the court of appeals's opinion; the countervailing governmental interests were assessed as well. After a review of the record, the court of appeals determined that the state's interest in prosecuting appellant for possession of a controlled substance did not justify the amount of force used because: 1) appellant was already subject to arrest for other offenses; 2) the loss or destruction of the cocaine held in appellant's mouth was no longer imminent; 3) no evidence suggested that the cocaine in appellant's hand was subject to destruction; and 4) the state did little to demonstrate that less painful options were available.

The state asserts that the court's reasoning fails to take into account the valid state interest of preventing a suspect from suffering adverse health effects, or even death, while in the custody of law enforcement. We agree that the state's interest in the safety of suspects, law enforcement, and the general public is important. However, given the facts of the case before us, the safety concerns had dissipated by the time the repeated Taser use at the hospital occurred. Appellant had been tased twice, brought to the ground, and put in a "throat hold" by the time Officer Arp took custody of him.

---

[56] *Lewis v. Downey, et al.*, 581 F.3d 467, 475; 2009 U.S. App. LEXIS 19974 at *17 (citing *Hudson v. McMillian, et al.*, 503 U.S. 1, 9 (1992)). While used as an evaluation of Taser guns from an Eighth Amendment perspective, we find it relevant in the Fourth Amendment context as well.

A considerable amount of time passed between Officer Williams's initial observation of appellant and the force used by Officer Arp, yet appellant had still not swallowed the substance. Officer Williams testified that he did not believe appellant was going to swallow the item, but was simply holding it in his mouth; he also conceded that crack cocaine will not dissolve in saliva. He told Officer Arp about the previous, ineffective tasing, yet Officer Arp chose to pursue the same ineffective course. While Officer Arp and Officer Williams testified that medical personnel attempted to use ammonia capsules, the court of appeals correctly noted that the state failed to show that any other medical procedures were used or that no less intrusive options were available.

We hold that the testimony presented by the officers establishes that a number of the trial court's implied findings are not supported by the record. The record does, however, support the finding by the court of appeals that the force used at the UMC Hospital by Officer Arp in order to recover the crack cocaine was excessive and unreasonable and, as a result, appellant's motion to suppress should have been granted.[57]

We emphasize that neither this opinion, nor that of the court of appeals, should be construed to imply that the use of a Taser is *per se* unreasonable. The court of appeals pointed to *Ellis v. Columbus City Police Dep't*, in which the United States district court found it reasonable for officers

---

[57] In a bill of exceptions, retired Lubbock Police Department Sergeant David Hagler testified that he was the first instructor in Lubbock to instruct other officers on the use of Tasers and that he set out the original protocol on the use of Tasers, which was essentially what was in the manual written by the manufacturer. The protocol as it existed at the time that the Lubbock Police Department began using Tasers was that Taser were to be used to gain control of a subject and that, once the subject was under control, e.g., handcuffed, the Taser was not to be used. IV R.R at 300-01. Sergeant Hagler had read the police reports and testified that, under the circumstances, Officer Williams had acted appropriately in tasing appellant twice. However, he was "bothered" by Officer Arp's behavior in tasing appellant repeatedly when he was in handcuffs and also the area he chose for tasing; the original protocol followed the manufacturer's instruction to tase on the back below the neck and on the thorax below the ribs. The groin and head, especially the eyes, were to be avoided. IV R.R. 301-06. He also testified that drive stuns were more likely to cause burns because of arcing from the Taser to skin if the Taser was close to the body but not in contact with it. IV R.R. at 299.

to tase a suspect several times during his arrest after he had lunged at officers and was openly chewing a plastic bag of cocaine,[58] but in *Ellis*, the officers stopped after tasing appellant several times during the arrest.[59] While this Court has not directly considered the ramifications of the use of a Taser, it has found other uses of force to be reasonable to prevent a suspect from swallowing evidence, depending on the circumstances.[60]

This Court finds that the circumstances presented by this case show an excessive use of force that violated the Fourth Amendment prohibition against unreasonable seizures. Officer Arp deliberately chose to administer numerous electrical shocks to an area of appellant's body chosen by him because of its exceptional sensitivity, long after the initial arrest was made, when there admittedly was no ongoing attempt by appellant to destroy the evidence, little concern about a drug overdose, and while appellant was restrained in handcuffs behind his back. The unreasonableness of this behavior is shown by comparison with the decisions made by his fellow officers, who stopped using the Taser when its use failed to effect compliance. While those officers could have chosen to continue to shock appellant in order to recover the crack, they chose to pursue other methods. Officer Arp should have done the same. We affirm the judgment of the court of appeals.

Delivered: April 6, 2011
Publish

---

[58] *Ellis v. Columbus City Police Dep't.,* No. 1:07CV123-A-A, 2009 U.S. Dist. LEXIS 95821 (N.D.Miss. September 15, 2009).

[59] *Id*.

[60] *Hernandez v. State*, 548 S.W.2d 904 (Tex. Crim. App. 1977).