**Opinion issued March 10, 2015**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00769-CR

————————————

**MONA YVETTE NELSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1394964**

---

## O P I N I O N

Appellant Mona Yvette Nelson was charged with the offense of capital murder. TEX. PENAL CODE § 19.03. After a plea of "not guilty," the case was tried to the court, which found Nelson guilty and sentenced her to life in prison. On appeal, Nelson contends that the trial court abused its discretion when it admitted

into evidence her statements made to the police after she had asked to speak to a lawyer. Applying the standard of *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682 (1980), we conclude that the record supports the trial court's factual determination that Nelson's statements were not the result of further interrogation without her lawyer present. Accordingly, we affirm.

## Background

The complainant, a 12-year-old boy named Jonathan, went missing on the afternoon of Christmas Eve 2010. The police were called that evening, and a missing-person report was filed on Christmas day. Jonathan's dead body was found three days later, in a drainage pipe across the street from a warehouse. The boy's wrists were tied behind his back, and his body was so badly burned that a visual identification was impossible.

The police reviewed surveillance video obtained from the warehouse. Footage from Christmas Eve showed that at 6:06 p.m. a gray truck with distinctive wheels stopped near where the body was found. A person wearing a white shirt and a white baseball cap was shown walking outside of the truck, appearing to move items in the bed of the truck. As cars passed by, the person ducked down behind the truck.

When officers were told to be on lookout for the truck in the surveillance video, two officers investigating Jonathan's disappearance were driving up to the

home of appellant Mona Nelson. The officers noticed that her truck, with its distinctive wheels, matched the description. Nelson consented to a search of her truck, and then she voluntarily accompanied the officers to police headquarters for an interview. This interview was the first in a series of interviews she gave to the police over the course of two days.

Nelson gave a videorecorded statement during her first interview. She was acquainted with Jonathan, and she admitted seeing him on Christmas Eve. Nelson denied having anything to do with Jonathan's disappearance, and she stated that no one else used her truck that day. Following that statement, she gave the police permission to search her home. She also agreed to participate in a live lineup.

Later that evening, Sergeant B. Harris, one of the lead investigators, asked Nelson if she would speak with him. She agreed, and they began a second recorded interview at 1:26 a.m. Sgt. Harris informed Nelson that a witness placed her at Jonathan's last known location around the time he disappeared. She was also shown the surveillance video that showed a truck similar to hers at the site where Jonathan's body was found. Nelson denied that the truck was hers. After about an hour, Nelson terminated the interview, so Sgt. Harris returned her to her home. The two agreed to speak again later that day.

By 8:25 a.m., the police had secured a warrant for Nelson's arrest. Sgt. Harris and the other lead investigator, Officer P. Waters, met Nelson at her

3

house and asked if she would speak with them again. Nelson agreed to a third interview. Sgt. Harris told her that she was free to go and not under arrest at the time. During the interview at police headquarters, Nelson began coughing and spitting up blood. When she asked to stop the interview so she could go to see a doctor, she was placed under arrest. Nelson then invoked her right to a lawyer, stating, "I want a lawyer. I don't want to talk anymore." The investigating officers took Nelson to a police station to be booked into jail.

During the drive to the jail, Sgt. Harris and Officer Waters turned up their AM/FM car radio to have a conversation without Nelson hearing. The record is essentially undisputed that the investigators' conversation discussed the "horrific" circumstances under which Jonathan was "burned alive" and "burned to a crisp." Upon reaching the police station, Nelson had become emotional. She cooperated with routine booking questions and stated that she was "not a monster." Sgt. Harris responded, "Well, we don't . . . know anything other than what we've got to go with." Nelson told him to keep investigating, and he responded that he couldn't have a conversation with her because she had "lawyered up." Nelson replied, "You had told me earlier that if I reached out to you . . . we could talk. So, I'm reaching out."

The investigating officers then took Nelson back to the headquarters for a fourth recorded interview, stopping along the way at a hospital so she could

4

receive treatment. At the headquarters, she waived her right to counsel and dictated a written custodial statement, which was also recorded. Nelson later moved before trial to suppress the evidence of her inculpatory statements in the fourth recorded interview, on the grounds that they were improperly elicited after she had invoked her right to counsel. The trial court denied the motion to suppress, and Nelson ultimately was convicted of capital murder and sentenced to life in prison.

**Analysis**

On appeal, Nelson argues in a single issue that the admission of her statements in the fourth interview violated her rights under the Fifth and Fourteenth Amendments to the United States Constitution.

In reviewing the trial court's ruling on a motion to suppress statements made as a result of custodial interrogation, we apply a bifurcated standard of review. *Pecina v. State*, 361 S.W.3d 68, 78–79 (Tex. Crim. App. 2012) (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). We review the ruling in light of the totality of the circumstances, giving total deference to the trial court on questions of historical fact, as well as its application of law to fact questions that turn on credibility and demeanor. *Id*. at 79; *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011). But we review de novo the trial court's rulings on questions of law and mixed questions of law and fact that do not depend on credibility determinations. *Pecina*, 361 S.W.3d at 79; *Leza*, 351 S.W.3d at 349. We

view the record in the light most favorable to the trial court's ruling and reverse the judgment only if it is outside the zone of reasonable disagreement. *Hereford v. State*, 339 S.W.3d 111, 118 (Tex. Crim. App. 2011). When the trial court makes no express, written findings of fact following its ruling on a motion to suppress, we must presume that the trial court found facts consistent with its ruling as long as the implied findings are supported by the record. *Id.*

To protect the privilege against self-incrimination guaranteed by the Fifth Amendment, police may not conduct a custodial interrogation of a suspect who has requested the assistance of counsel. *Minnick v. Mississippi*, 498 U.S. 146, 147, 111 S. Ct. 486, 488 (1990); *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1884–85 (1981). Once an individual in custody invokes her right to counsel, "interrogation 'must cease until an attorney is present.'" *Minnick*, 498 U.S. at 150, 111 S. Ct. at 489 (quoting *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 1628 (1966)). Thus statements made in response to further police-initiated questioning without the presence of an attorney are inadmissible, even if made after the suspect is again advised of her rights. *Id.* at 150–51, 111 S. Ct. at 489.

Before a subject in custody can be subjected to further interrogation after she requests an attorney, there must be a showing that the suspect herself initiated dialogue with the authorities. *Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1885. Once a suspect has invoked her right to counsel, her unwillingness to communicate

6

with authorities without the presence of counsel "is presumed to persist" unless the suspect herself "initiates further conversation about the investigation." *Cross v. State*, 144 S.W.3d 521, 526 (Tex. Crim. App. 2004). To establish that a suspect has waived her previously-invoked right to counsel, the State must prove two things: that the suspect herself initiated further communication with the authorities; and that she thereafter validly waived her right to counsel. *Id*. at 526–27. A valid waiver of the right to counsel cannot be established by "showing only that [the accused] responded to further police-initiated custodial interrogation, even if [she] has been advised of [her] rights." *Edwards*, 451 U.S. at 484, 101 S. Ct. at 1884–85.

In this context, the term "interrogation" refers "not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689–90 (1980); *Moran v. State*, 213 S.W.3d 917, 922–23 (Tex. Crim. App. 2007). The determination of whether the police should know such actions are reasonably likely to elicit an incriminating response "focuses primarily on the perceptions of the suspect, rather than the intent of the police." *Innis*, 446 U.S. at 301, 100 S. Ct. at 1690. Furthermore, "[a]ny knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an

important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301 n. 8, 100 S. Ct. at 1690 n.8. Off-hand remarks that are not particularly evocative under the circumstances do not constitute interrogation, as opposed to subjecting the suspect to a "lengthy harangue." *Id*. at 303, 100 S. Ct. at 1691.

In this case, the trial court determined, and the parties agree, that Nelson invoked her right to counsel during the third interview. The trial court also determined that Nelson was in custody after the third interview. The disputed question on appeal is whether the police officers used impermissible interrogation techniques to prompt Nelson's renewed communications, which led to the fourth interview.

At the hearing on the motion to suppress, the trial court heard testimony regarding the actions of the police between Nelson's initial invocation of her right to counsel and her later reinitiation of communication with the police. Sgt. Harris testified that in their car on the way to book Nelson into jail, he and Officer Waters had a conversation in the front seat. Nelson was in the back seat, and the officers turned on their car radio. Sgt. Harris testified that he and Officer Waters spoke in a low voice so that Nelson would not be able to hear. He stated that they discussed the management and dynamics of the case, as well as "the fact of this little boy

who had been found the way he had been found" and "how horrific the case was." He admitted that he may have said something like Jonathan "was burned to a crisp and how terrible it must have felt to be burned alive." He stated that he never looked back at Nelson during the ride. Once they arrived at the substation, he noticed that Nelson's demeanor had changed and that she "had a tear, some sniffles." Officer Waters generally corroborated Sgt. Harris's account. He testified that Sgt. Harris "may have made a comment . . . about the way [Jonathan] died." Further, he said that Nelson appeared to be emotional when they arrived at the substation.

Nelson testified to a different version of events. She testified that the radio was never on and that Sgt. Harris looked at her in the rearview mirror while discussing how someone with kids would want to help with Jonathan's case. She said that she heard the officers speaking of how "poor Jonathan's body was burnt," and "how sad it was that he had to go that way." She further stated that they remarked, "[Y]ou would think somebody with kids would want to help and give as much information as possible." Nelson also testified about her discussion with Sgt. Harris once they had arrived at the police station:

> Q:   And after you had tears in your eyes after hearing them talk, did you say anything to them?
>
> A:   No, sir, not until we got to the jail, he opened the door and saw that I was upset. And he said, "Look, it's clear that you—you know, you have kids. And if you reach out to us, if there's

anything you can tell us, you know, wouldn't you want to know? Wouldn't you want to know what happened? And if you had any information, I mean, wouldn't you want to know? And if you—if you reach out to us, we can—we can help you, you know, if you help us. I mean, we can—we can get you proper medical treatment. You don't have to go in there and, you know, be treated—you know, how they treat prisoners in there."

The trial court denied Nelson's motion to suppress her statements in the fourth interview and explained its findings from the bench. The court noted that it was "crucial" to its findings that it believed Nelson to be "educated" and "intelligent." As such, the court did not believe "that the comments did elicit her reinitiating the conversation." The court further found that the investigators' conversation was "not intended to get her to start talking," since the officers "had been talking to her many, many times before and none of the other methodologies seemed to get her to really talk or say too much." In conclusion, the court found "the defendant did reinitiate conversation," that in the fourth interview Nelson "was once again given all of her warnings," and that "she did waive all of those rights and voluntarily agree to give a statement."

The question of whether the officers violated the prohibition on interrogation in this case, after Nelson asserted her right to counsel, is similar to the circumstances of *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682 (1980). In that case, the defendant was accused of murdering a taxi driver. *Innis*, 446 U.S. at 293, 100 S. Ct. at 1686. The murder weapon was believed to be a sawed-off

10

shotgun, although the defendant was unarmed when he was found by the police. *Id*. at 294, 100 S. Ct. at 1686. After the defendant was arrested and advised of his *Miranda* rights, he requested a lawyer. *Id*. He was placed in a vehicle with three officers to be driven to the police station. *Id*.

As they drove to the station, two officers discussed the missing shotgun, which they believed to be in an area near a school. *Id*. at 294–95, 100 S. Ct. at 1686–87. One of the officers remarked that, because a school for disabled children was nearby, there were a lot of those children running around, and "God forbid one of them might find a weapon with shells and they might hurt themselves." *Id*. The defendant then interrupted the officers, asking them to turn the car around so he could show them where the gun was located. *Id*. at 295, 100 S. Ct. at 1687.

The Supreme Court considered whether the actions of the police amounted to the "functional equivalent" of express questioning, such that they would have violated *Miranda*'s safeguards against custodial interrogation without a lawyer present. *Id*. at 298, 100 S. Ct. at 1688. After explaining that "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" would constitute the functional equivalent of express questioning, the Court determined that the officer's remarks did not rise to the level of interrogation. *Id*. at 301–03, 100 S. Ct. at 1689–91.

11

To support its conclusion, the Court observed that nothing in the record suggested that the defendant was "particularly susceptible to an appeal to his conscience" concerning the safety of disabled children. *Id*. at 302, 100 S. Ct. at 1690. The Court further observed that nothing in the record suggested that the police knew that the defendant was "unusually disoriented or upset at the time of his arrest," noting that nothing suggested that the officers' remarks were designed to elicit a response. *Id*. at 302–03 & n.9, 100 S. Ct. at 1690 & n.9. Furthermore, the Court evaluated the officers' remarks "in the context of a brief conversation," observing that the entire dialogue "consisted of no more than a few off hand remarks," as opposed to a "lengthy harangue in the presence of the suspect." *Id*. at 303, 100 S. Ct. at 1691. The Court conceded that the conversation provided "subtle compulsion," but it held that subtle compulsion, standing alone, does not establish that the officers should have known that their words or actions were reasonably likely to elicit an incriminating response. *Id*. at 303, 100 S. Ct. at 1691.

Justice Marshall dissented, joined by Justice Brennan. *Id*. at 305, 100 S. Ct. at 1692. The dissent agreed with the Court's definition of interrogation, but not its application of that definition to the officers' conversation. It reasoned that the comments would have constituted interrogation had they been directed at the defendant, and "the result should not be different because they were nominally addressed" to another officer. *Id*. at 306, 100 S. Ct. at 1692. Notably, the dissent

pointed out that "an appeal to a suspect to confess for the sake of others, to 'display some evidence of decency and honor,' is a classic interrogation technique." *Id*.

Applying the *Innis* standard, and viewing the record in the light most favorable to the trial court's ruling, we conclude that the trial court did not commit reversible error by determining that the officers could not be imputed with knowledge that their actions were reasonably likely to elicit an incriminating response. In this regard, we must defer to the trial court's application of law to facts that turn on credibility. *Pecina*, 361 S.W.3d at 79.

As in *Innis*, in which the Supreme Court concluded the officers' remarks were not designed to elicit a response, we likewise conclude that the record supports a conclusion that the conversation conceded by the officers amounted to no more than "subtle compulsion" that did not rise to the level of interrogation. *See Innis*, 446 U.S. at 303, 100 S. Ct. at 1690. The record supports the implied factual conclusion that the officers turned up the radio in the car specifically to prevent Nelson from hearing their conversation. Furthermore, after observing the testimony the trial court found that Nelson was "educated" and "intelligent," expressly stating that she was not actually affected by the officers' discussion, and also implying a finding that she was not unusually susceptible to any particular form of persuasion inherent in the officers' comments. *See id.* at 302 n.8, 100 S. Ct. at 1690 n.8. Nelson does not dispute or challenge the trial court's assessment of her as

"educated" and "intelligent." The officers' remarks were brief, off-hand comments; like *Innis*, this is "not a case where the police carried on a lengthy harangue in the presence of the suspect." *See id.* at 303, 100 S. Ct. at 1691.

The essence of Nelson's argument is that the experienced police investigators involved in this case used an interrogation technique to deliberately elicit her self-incriminating statements. But the trial court found that did not happen in this case. To the extent Nelson's argument nevertheless characterizes the officers' statements as an interrogation technique, the argument is indistinguishable from the observations made in Justice Marshall's *Innis* dissent— and rejected by the *Innis* majority.

Nelson also attempts to analogize this case to the actions of officers in the noted "Christian burial speech" at issue in *Brewer v. Williams*, 430 U.S. 387, 97 S. Ct. 1232 (1977). In *Brewer*, a police officer addressed the respondent, who was a deeply religious former mental-health patient, while driving him to jail. *Id*. at 390–393, 97 S. Ct. at 1235–36. The officer stated that the parents of a missing girl should be entitled to a "Christian burial for the little girl who was snatched away from them on Christmas (E)ve and murdered." *Id*. at 392–93, 97 S. Ct. at 1236. Williams then directed the officers to the body. *Id*. at 393, 97 S. Ct. at 1236. The Supreme Court held that the officer's speech, despite not involving any questions directed at the respondent, resulted in a Sixth Amendment violation. *Id*. at 397–98,

14

97 S. Ct. at 1239. The Court determined that the officer had "deliberately and designedly set out to elicit information from [the defendant] just as surely as and perhaps more effectively than if he had formally interrogated him." *Id*. at 399, 97 S. Ct. at 1240.

Nelson's analogy to *Brewer* is unavailing. To the extent that the Court's analysis in *Brewer* extends to the determination of whether police conduct constitutes interrogation under the Fifth Amendment, that case involved a mental-health patient, whom the police officer knew was deeply religious. *Id*. at 390–93. Indeed, the police officer in *Brewer* testified that he was attempting to extract information from the defendant when he made the Christian burial speech. *Id*. at 399. And, unlike the facts before us, the officer's remarks in *Brewer* were both lengthy and directed at the defendant. *Compare id.* at 392–93, 97 S. Ct. at 1236, *with Moreno v. State*, No. 01-85-00551-CR, 1987 WL 6130, at *3 (Tex. App.—Houston [1st Dist.] Feb. 5, 1987, pet. ref'd) (mem. op., not designated for publication) (relying on *Innis*, holding that officer's remark to appellant, "you need to find God again if you knew him at one time," was not akin to statements in *Brewer* because it was only an "off-hand remark").

In sum, viewed in the light most favorable to the trial court's ruling, the record supports the conclusion that the officers, while discussing the case with each other in hushed voices and with the radio turned up to ensure they could not

be heard, should not be charged with knowledge that their discussion was reasonably likely to elicit an incriminating response. *See Innis*, 446 U.S. at 301, 100 S. Ct. at 1689–90. As such, their actions did not constitute interrogation within the meaning of *Miranda*, Nelson's waiver of her right to counsel was valid, and her Fifth Amendment right to counsel was not violated. *See Edwards*, 451 U.S. at 484–85, 101 S. Ct. at 1884–85.

We affirm the trial court's denial of Nelson's motion to suppress her fourth interview.

## Conclusion

We affirm the trial court's judgment.

Michael Massengale
Justice

Panel consists of Justices Massengale, Brown, and Huddle.

Publish. TEX. R. APP. P. 47.2(b).