

**NUMBER 13-10-013-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**VICTOR MARTINEZ SOTO,**                         **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                **Appellee.**

---

### On appeal from the 92nd District Court of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

### Before Justices Benavides, Vela, and Perkes Memorandum Opinion by Justice Vela

A jury found appellant, Victor Martinez Soto, guilty of one count of murder, *see* TEX. PENAL CODE ANN. § 19.02(b) (West 2003), and three counts of aggravated assault. *See id.* § 22.02(a)(2). The jury assessed punishment at fifty-eight years' imprisonment for the murder conviction and five years' imprisonment for each count of aggravated assault. The sentences are to run concurrently. In five issues, appellant contends the

trial court erred by: (1) denying his motion to suppress; (2) allowing improper impeachment: (3) admitting an irrelevant exhibit; (4) allowing improper argument; and (5) he claims the number of errors had a cumulative and harmful effect. We affirm.

## I. FACTUAL BACKGROUND

This case involves the murder of Juan Vasquez, whom appellant befriended at a party. In the early morning of June 22, 2003, Vasquez and appellant left the party together, and Vasquez's body was found later that morning in the Lopezville area of San Juan, Texas. He had been murdered by a close-range shotgun blast to his abdomen.

Vasquez's uncle, Alvaro Rivera, testified that during the party, Vasquez hit appellant's cap. When Alvaro and appellant went to buy more beer, appellant told Alvaro, "[T]his dude [Vasquez] hit me like this on my cap. And he better stop because I'm going to hit him." After they returned with the beer, he saw appellant and Vasquez walking together into the neighborhood. When they failed to return, Alvaro started looking for Vasquez and saw appellant leaving an apartment, carrying a shotgun. Appellant got into Alvaro's car and told him, "I already f***ed up the guy." Alvaro asked what happened, and appellant said, "[T]he dude was screwing with me and he had a .38." While Alvaro tried to find Vasquez, appellant asked him, "[W]hat was he to you?" Alvaro told him, "[H]e is my nephew." Afterwards, appellant got out of the car. On cross-examination, when defense counsel asked Alvaro, "Did you see any blood on his hands, his face or anywhere at all?", he said, "No, but he told me that he had killed him."

Alvaro returned to the house where he and his two brothers, Santiago and Raul Rivera, waited outside for the police. At that time, appellant arrived with a .22 pistol and

2

a shotgun. He stated, "[W]ho is next[?]" and pointed one of the guns at the three brothers. Pointing the gun at Santiago, appellant said, "[Y]ou look like you're a cool guy but I'm going to screw you over." When the prosecutor asked Santiago, "Were you afraid that he might shoot you?", he said, "Yes, to anyone of us." Appellant told Alvaro, "[I]f I already f***ed him up then why can't I f*** you up." At some point, Antonia Rivera and Alvaro's wife got in front of the brothers and told appellant to leave.

Later that morning, Deputy Omar Salazar was dispatched to a residence where he found Vasquez's body lying in the front yard. While securing the crime scene, he received a second dispatch, advising him there was a shooting that morning and that the person involved was located at a "second residence near by." Upon arriving at the second residence, he saw that it was a lot with two homes, one on the left and one on the right, separated by an open carport. Appellant lived in the home on the right, and Merced Anaya[1] lived in and owned the home on the left. Anaya gave Deputy Salazar written permission to search his home. While inside the laundry room of the home, Deputy Salazar saw a dresser with its top drawer open "about four inches." He looked in the drawer and saw what appeared to be weapons. He said a person could enter the laundry room through the carport.

Sandra Rangel, a crime-scene specialist, seized the guns from the laundry room, along with an empty casing that was in the shotgun. The State's firearms expert testified that in his expert opinion, the "shot wad" recovered from Vasquez's body had been fired from the shotgun that Rangel recovered from the laundry room.

---

[1] Merced Anaya died before he could testify at either the suppression hearing or the trial on the merits.

3

Appellant did not testify at the guilt-innocence phase of trial, and the defense did not call any witnesses to testify on his behalf.

## II. DISCUSSION

### A. Motion to Suppress

In issue one, appellant argues the trial court erred in denying his motion to suppress. Defense counsel filed a pretrial motion to suppress the firearms and empty casing seized during the warrantless search of Anaya's home.

#### 1. Standard of Review

"In reviewing the trial court's denial of a motion to suppress, an appellate court must uphold the trial court's ruling as long as it is reasonably supported by the record and is correct under any applicable theory of law." *Hereford v. State*, 339 S.W.3d 111, 117–18 (Tex. Crim. App. 2011) (citing *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). "The appellate court must view the record in the light most favorable to the trial court's ruling and reverse that ruling only if it lies outside the zone of reasonable disagreement." *Id.* at 118 (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)).

Here, the trial court filed findings of fact and conclusions of law. In *Guzman*, the court "clarified the levels of deference given to the trial court's findings of fact in a motion to suppress." *Id.* (citing *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997)). "In its review, the appellate court does not perform its own fact-finding mission, but limits the scope of its factual review to determining whether the trial court's findings were reasonable in light of the evidence presented. *Id.* (citing *Romero*, 800 S.W.2d at 543).

"If these findings are reasonable, the appellate court must defer to the trial court." *Id.* (citing *Romero*, 800 S.W.2d at 543). However, as the *Guzman* court explained, "this standard of almost total deference applies only to findings of historical fact and 'mixed questions of law and fact' that rely upon the credibility of a witness." *Id.* (citing *Guzman*, 955 S.W.2d at 87). "It has long been recognized that, during a hearing on a motion to suppress, the trial judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony." *Id.* (citing *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *Romero*, 800 S.W.2d at 543). "The trial judge has the opportunity to view the demeanor of the witnesses and is therefore in a better position to make those factual determinations than appellate judges." *Id.*

"The trial judge's comparative advantage is lesser in review of pure questions of law and in mixed questions of law and fact that do not depend on credibility determinations. Such topics might include determinations of reasonable suspicion or probable cause as well as other applications of the law of search and seizure." *Id.* (citing *Guzman*, 955 S.W.2d at 87; *Dixon*, 206 S.W.3d at 590). "An appellate court reviews these questions *de novo*;[2] 'Independent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles.'" *Id.* (citing *Guzman*, 955 S.W.2d at 87). "This application requires a Fourth Amendment reasonableness review, thus, the appellate court reviews it *de novo*." *Id.* (citing *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000); *Guzman*, 955 S.W.2d at 87).

---

[2] Citing *Johnson v. State*, 84 S.W.3d 658 (Tex. Crim. App. 2002).

**2. Analysis**

**a. Consent To Search**

In its findings of fact and conclusions of law, the trial court found that the search of the laundry room was based on voluntary consent given by Merced Anaya, the owner of the property where the weapons were found. The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *Limon v. State*, 340 S.W.3d 753, 756 (Tex. Crim. App. 2011); *see Illinois v. Rodriguez*, 497 U.S. 177, 179 (1990). "[T]he search of a residence without a judicially authorized warrant is presumptively unreasonable." *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007).

Here, while Deputy Salazar did not have a warrant to search Anaya's house or to seize the firearms and empty shell casing, consent is an exception to the warrant requirement and is valid when it is voluntarily given. *Id*. at 686. "The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily." *Id*. "This burden includes proving that consent was not the result of duress or coercion." *Id*. "Consent is not established by 'showing no more than acquiescence to a lawful authority.'" *Carmouche*, 10 S.W.3d at 331 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). To determine whether the State met its burden, we look at the totality of the circumstances. G*utierrez*, 221 S.W.3d at 686–87. If the record supports a finding by clear and convincing evidence that consent to search was free and voluntary, we will not disturb that finding. *Carmouche*, 10 S.W.3d at 331.

During the pretrial suppression hearing, Deputy Salazar testified he asked Merced Anaya for permission to look for the suspect in Anaya's house and that Anaya gave him "written permission to search it." Deputy Salazar filled out the consent-to-search form, and Anaya signed it "with an X." He said Anaya's son[3] signed the form as a witness. below where Anaya placed his "X."

The consent-to-search form was preprinted in the Spanish language. The English-language version[4] stated, in relevant part:

> I Merced Anaya 3-2-22 hereby grant my consent to officers Omar Salazar and F. Rodriguez[5] of the HIDALGO CO. SHERIFF's DEPT. to search the following: Apartment/Home located at: RT-1 Box 210-53 San Juan, TX. Red & White frame house. I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.
>
> I further state that no promises, threats, force, or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

Nothing in the record shows that Deputy Salazar or any other person used duress, threats, or coercion to obtain Anaya's consent. The record does not show Anaya was under arrest or wearing handcuffs when he consented to the search. The consent-to-search form made Anaya aware of his right to refuse consent to a search of his home, and Deputy Salazar testified he explained to Anaya that he did not have to give consent to search his house. With respect to the consent-to-search form, Deputy Salazar testified Anaya understood what he was signing, and the record does not show the State obtained Anaya's consent "by 'showing no more than acquiescence to a lawful

---

[3] Merced Anaya's son did not testify at the suppression hearing.

[4] An English-language version of the consent-to-search form was admitted into evidence during the suppression hearing and is part of the appellate record.

[5] Officer Rodriguez did not testify at the suppression hearing.

authority.'"  *See Carmouche*, 10 S.W.3d at 331 (quoting *Bumper,* 391 U.S. at 548).

Consequently, Anaya's consent was valid because it was freely and voluntarily given.  *See Gutierrez*, 221 S.W.3d at 686.  Looking at the totality of the circumstances, we conclude the record supports a finding, by clear and convincing evidence, that Anaya's consent to the search of his home was free and voluntary, and not the result of duress or coercion.  The trial court did not abuse its discretion by denying the motion to suppress on this basis.

### b. Apparent Authority

In its findings of fact and conclusions of law, the trial court found that even if Anaya did not have actual authority to consent to a search of the location where the weapons were found, he had "apparent authority to consent to a search of that location." Recently, the court of criminal appeals stated that "consent may be validly obtained from an individual with apparent authority over the premises."  *Limon*, 340 S.W.3d at 756 (citing *Rodriguez*, 497 U.S. at 188).  "Apparent authority is judged under an objective standard:  would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?"  *Id.* (internal quotation marks omitted).  The State must prove "apparent authority by a preponderance of the evidence."  *Id.* at 757.  "On appeal, determinations of . . . apparent authority are reviewed *de novo* as mixed questions of law and fact."  *Id.* (citing *Hubert v. State*, 312 S.W.3d 554, 562 (Tex. Crim. App. 2010)).

Deputy Salazar testified during the suppression hearing that when he arrived at Anaya's home, "I encountered two old people, a male and a female. . . .  I got their

8

names. And I asked to see if they were the owners of the property." Deputy Salazar testified that the man's name was "Merced [Anaya]." When the prosecutor asked Deputy Salazar, "And do you know if they were the owners of the property?", he said, "They told me they were." Thus, under the facts available to Deputy Salazar at the moment, we find that a person of reasonable caution could reasonably believe that Anaya had the authority to consent to an entry and search of the home under those circumstances.

### c. Plain-View Doctrine

In its findings of fact and conclusions of law, the trial court found that the plain view doctrine applied to the discovery of the weapons. Deputy Salazar testified at the suppression hearing that while in the laundry room, he saw a dresser with its top drawer partially open. Using his flashlight, he saw "two weapons" inside the top drawer. Even though he did not examine Vasquez's body for gunshot wounds, he testified "the thing that was talked about was the shooting, so I figured there was some kind . . . of firearm." He pulled the dresser's top drawer open "a couple of inches more to confirm that there were weapons" and found "a small shotgun and a revolver" inside the drawer.

During the suppression hearing, Sandra Rangel, the crime-scene specialist, testified on cross-examination that when she entered the laundry room, the dresser drawers "were partially open . . . maybe not even four inches." She "had to pull it [the drawer with the weapons] open completely so that [she] could see the weapons." When defense counsel asked her, "Otherwise, if you're just passing by the drawer you wouldn't be able to notice that there was weapons inside; is that fair to say?", she said, "That's fair

to say, yes."

The plain-view doctrine is an exception to the Fourth Amendment's warrant requirement. *Horton v. California*, 496 U.S. 128, 133 (1990). In *State v. Dobbs*, the court of criminal appeals stated:

> A police officer who is lawfully on private premises pursuant to a warrant (or some legitimate exception to the Fourth Amendment requirement of a warrant) may . . . seize anything he discovers in plain view on those premises if it is "immediately apparent" to him—that is to say, if he has probable cause to believe—that it constituted contraband, without the necessity of obtaining a second warrant to justify the seizure.

323 S.W.3d 184, 187 (Tex. Crim. App. 2010).

Here, Deputy Salazar was lawfully on the private premises by virtue of the fact that Anaya gave him written consent to search it. While in the laundry room, he saw a partially opened dresser drawer. Before he opened it any further, he, by use of a flashlight, saw "two weapons" inside. The fact that he intentionally looked into the dresser drawer that was only partially open does not affect the application of the plain-view doctrine because the Fourth Amendment does not require the discovery of evidence to be inadvertent. *Horton,* 496 U.S. at 140; *Johnson v. State*, 469 S.W.2d 581, 584 (Tex. Crim. App. 1971) (finding that police did not conduct search when they looked into a window through a two-inch gap between partially drawn draperies and saw stolen goods). Furthermore, the fact that Deputy Salazar used a flashlight as a visual aid to see into the drawer does not affect the application of the plain-view doctrine. A vision-enhancement device such as a flashlight does not affect the application of the plain-view doctrine. *Texas v. Brown*, 460 U.S. 730, 740 (1983) (stating, "the use of artificial means to illuminate a darkened area simply does not constitute a search.").

In addition, when Deputy Salazar saw these weapons, he was aware of the following facts and circumstances: (1) a dead body was at the first location; (2) while at that location, dispatch advised him that the "suspect in the shooting was at the second house;" (3) when he went to the second location, he saw two homes on the same property; and (4) he was looking for appellant inside the home where the firearms were located. These facts and circumstances gave him probable cause to believe the firearms were connected to the shooting. Therefore, it was immediately apparent to him that the firearms constituted contraband.

Even though Rangel testified she had to completely open the drawer to see the weapons, it was within the trial court's province to believe Deputy Salazar's testimony that he could see the weapons when the drawer was only "partially open." *See Hereford*, 339 S.W.3d at 118 (stating, "It has long been recognized that, during a hearing on a motion to suppress, the trial judge is the sole judge of the credibility of the witnesses and the weight to be given their testimony."). Consequently, the plain-view doctrine applies to seizure of the firearms and empty casing. We hold that the trial court did not abuse its discretion by denying the motion to suppress. Issue one is overruled.

**B. Impeachment of State's Witness**

In issue two, appellant argues that during the State's case-in-chief, the trial court erred by allowing the prosecutor to improperly impeach its witness, Maria Maldonado.

**1. First Complaint**

While on direct examination, the prosecutor asked Maldonado several questions about the statements she gave to the police regarding appellant's conduct surrounding

11

Vasquez's murder. During this line of questioning, the prosecutor asked her about whether appellant told her to drive down Church Street. Next, the prosecutor asked her, "Do you remember he [appellant] asked you to go real slow?" Defense counsel objected that the question was "leading." The trial court overruled the objection and told the prosecutor, "[Y]ou can ask her if she made a statement. If she says no then you can . . . refresh her memory." Next, the prosecutor asked her, "Do you remember making a statement that--[.]" At that point, the trial court sua sponte held a bench conference[6] and then held a hearing outside the jury's presence during which defense counsel objected that "[t]he whole purpose of bringing her [Maldonado] as a witness is basically to get into hearsay evidence by impeaching her with her own statement. . . ." The trial court overruled the objection, and defense counsel did not request a running objection.

"A defendant must make a timely objection in order to preserve error in the admission of evidence." *Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997); *see* TEX. R. APP. P. 33.1(a)(1). "An objection should be made as soon as the ground for objection becomes apparent." *Lagrone,* 942 S.W.2d at 618. "If a defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason to justify the delay, his objection is untimely and error is waived." *Id.*

Here, defense counsel initially objected that the question was "leading." Afterwards, the prosecutor was in the process of asking Maldonado another question when the trial court interrupted him. Defense counsel did not make an objection referencing improper impeachment until the hearing outside the jury's presence.

_____
[6] The bench conference was not reported.

12

Because defense counsel failed to urge the improper-impeachment objection until well after an objectionable question had been asked and answered, and because he has offered no reason, legitimate or otherwise, to justify the delay, his objection is untimely and error, if any, is waived. *See id.* Furthermore, "[w]hether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial." *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009). Defense counsel objected that the question was leading; however, the complaint on appeal concerns improper impeachment. Thus, this complaint is not preserved. *See id.*

### 2. Second Complaint

After the hearing outside the jury's presence, the prosecutor asked Maldonado, "Do you recall making any statement that you took the Defendant to his stepfather's house to get a gun?" To this, she said, "That I remember vaguely but I'm not sure." Next, he asked her, "Do you remember making the statement to Noe Canales[7] and Fred Lara that--". At that point, defense counsel stated, "I'm going to object to improper impeachment." The trial court overruled the objection.

"Impeachment of a witness means adducing proof that such witness is unworthy of belief or credit." *Willingham v. State*, 897 S.W.2d 351, 358 (Tex. Crim. App. 1995). Rule 607 states that "[t]he credibility of a witness may be attacked by any party, including the party calling the witness." TEX. R. EVID. 607. A prior inconsistent statement may be admitted under rule 613. *See* TEX. R. EVID. 613(a); *In re A.B.*, 133 S.W.3d 869, 874 (Tex. App.—Dallas 2004, no pet.). However, under the Texas Rules of Evidence, the use of

---

[7] Noe Canales was the lead investigator in this case.

13

extrinsic evidence of a prior inconsistent statement is contingent upon the witness's response when confronted with the alleged inconsistent statement." *Clark v. State*, 881 S.W.2d 682, 695 n.11 (Tex. Crim. App. 1994); TEX. R. EVID. 613(a) (stating that extrinsic evidence of an inconsistent statement is not admissible if the witness unequivocally admits having made the statement).

Here, defense counsel objected to the question before the prosecutor could finish asking it. Thus, we cannot determine whether the prosecutor was trying to establish the proper predicate for impeachment by a prior inconsistent statement. Nevertheless, after the trial court overruled the objection, the prosecutor asked a different question.[8] We hold the trial court did not err by overruling the objection.

### 3. Third Complaint

During Maldonado's direct examination, the prosecutor asked her, "Do you recall ever making any statements to the police that at about 3:00 in the morning or so he [appellant] came home and that he told you that he had killed a brother or cousin of Alvaro [Rivera]?" Without objection, she said, "No." Next, he asked her, "Is this your signature? Let me show you what has been marked or what I have marked just for identification purposes as State's Exhibit No. 19 and let me let you look at it." At that point, the trial court told the prosecutor, "[T]hat's been asked and answered." After the trial court said this, defense counsel stated, "I just renew my same objection that this is improper impeachment of the witness." The trial court overruled the objection and

---

[8] The question the prosecutor asked was: "You don't recall making this statement that between 3:30 and 4:00 a.m. that you and Hugo [appellant] went to his mom's house and that he went to his father's room. And he spoke to his father, Magdaleno, and he asked him for a gun?" Without objection, Maldonado replied, "I don't know. Truthfully I don't know."

14

stated, "But that has been asked and answered."

If defense counsel was objecting to the question about whether Maldonado recalled making any statements to the police that appellant told her that he had killed Alvaro's brother or cousin, the objection was untimely and error, if any, was waived. *See* TEX. R. APP. P. 33.1(a)(1); *Lagrone*, 942 S.W.2d at 618. If defense counsel was objecting to the question that followed it, the trial court had already prevented Maldonado from answering the question by sua sponte ruling it had "been asked and answered." Issue two is overruled.

## C. Admission of Evidence

In issue three, appellant argues the trial court erred in admitting a crayon drawing that was found in Vasquez's clothing at the time of his autopsy.

### 1. Background

During the State's case-in-chief at guilt-innocence, the trial court held a hearing outside the jury's presence. The prosecutor told the trial court he wanted to introduce State's exhibit 70,[9] which included a crayon drawing, apparently made by a child. The prosecutor told the trial court he was introducing State's exhibit 70 because "this is the evidence that we recovered. . . . It was . . . in the victim's pockets. His items--his personal items." Defense counsel objected that the exhibit is irrelevant and that "any

---

[9] A copy of the complained-of exhibit is found and described in volume twenty-nine of the reporter's record. It is also described in volume twenty-four at page 127. The inscriptions "832.877RD" and "5769, 28134283" appear at the top of the drawing. The word "AMERICA" is written below the inscriptions. A car is drawn below the first "A" in "AMERICA," and a little donkey is drawn below the rear of the car. To the right of the car is a drawing of a bug, and to the left of the car is the word "MAR" with the letters "LL" underneath. Below the letters "LL" appears the date "4/Jun9." Under the word "AMERICA" appears the date, "5/June/09." Under this date appears "03." The days of the week in Spanish appear on the back of the drawing.

15

probative value is substantially outweighed by the prejudicial value. . . ." The trial court overruled the objection.

### 2. Standard of Review

We review a trial court's ruling regarding the admissibility of evidence under an abuse of discretion standard. *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007). "In other words, as long as the trial court's decision was within the zone of reasonable disagreement and was correct under any theory of law applicable to the case, it must be upheld." *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). In considering whether the record reasonably supports a trial court's determination, we view the evidence in the light most favorable to the trial court's determination. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008).

### 3. Rule 401

Texas Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401; *Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009). "Evidence which is not relevant is inadmissible." TEX. R. EVID. 402. "Evidence need not by itself prove or disprove a particular fact to be relevant; it is sufficient if the evidence provides a small nudge toward proving or disproving some fact of consequence." *Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004). In determining whether evidence is relevant, courts should examine the purpose for which the evidence is being introduced. *Layton*, 280 S.W.3d at 240. "It is critical that there is a direct or logical connection between the

16

actual evidence and the proposition sought to be proved." *Id.*

Here, the prosecutor introduced exhibit 70 to show the jury the evidence of personal items recovered in the victim's pockets. However, the crayon drawing does not provide a small nudge toward proving or disproving some fact of consequence. Accordingly, the crayon drawing is irrelevant and inadmissible. *See* Tᴇx. R. Eᴠɪᴅ. 402.

### 4. Harm Analysis

"Texas Rule of Appellate Procedure 44.2(b) provides that a nonconstitutional error 'that does not affect substantial rights must be disregarded.'" *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (quoting Tᴇx. R. Aᴘᴘ. P. 44.2(b)). The court of criminal appeals has "determined that substantial rights are not affected by the erroneous admission of evidence 'if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.'" *Motilla*, 78 S.W.3d at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)); *see Ex parte Martinez*, 330 S.W.3d 891, 903 (Tex. Crim. App. 2011). "In assessing the likelihood that the jury's decision was adversely affected by the error, the appellate court should consider everything in the record, including any testimony of physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Id.* (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)). "The reviewing court may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable." *Id.* at 355–56

17

(citing *Morales*, 32 S.W.3d at 867).  The court of criminal appeals has "also recognized that whether the State emphasized the error can be a factor."  *Id.* at 356.  (citing *King v. State*, 953 S.W.2d 266, 272 (Tex. Crim. App. 1997)).  In *Motilla*, the court held "that the evidence of the defendant's guilt is a factor to be considered in any thorough harm analysis."  *Id.* at 358.

### a. Evidence of Appellant's Guilt

The medical evidence showed that Vasquez died from a close-range shotgun blast to the abdomen.  During his autopsy, a shot wad was removed from his body.  Shortly after his murder, Rangel seized a shotgun from the laundry room of Anaya's house, which was next door to where appellant was staying at the time of the murder.  The laundry room was accessible from the carport that separated the two houses.  The evidence showed that this shot wad was fired from the shotgun recovered from the laundry room.  In addition to the forensic evidence, other evidence showed that shortly before Vasquez's murder, he had hit appellant's cap.  Afterwards, appellant told Alvaro that if Vasquez did not stop, he would hit Vasquez.  Afterwards, eyewitnesses saw appellant and Vasquez leaving the party together.  While Alvaro was looking for Vasquez, appellant got into his car, carrying a shotgun.  He told Alvaro that he killed Vasquez.  We note that appellant's statements to Alvaro about killing Vasquez evidenced a complete lack of remorse on appellant's part.  A jury can rely on a defendant's lack of remorse to infer intent to commit murder.  *See Darby v. State*, 145 S.W.3d 714, 721 (Tex. App.—Fort Worth 2004, pet. ref'd).  When Alvaro asked appellant what happened, he said, "[T]he dude was screwing

18

with me and he had a .38."[10]   "Motive is a significant circumstance indicating guilt." *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).   After Vasquez's murder, appellant absconded and could not be located by the authorities for several years.   A fact-finder may draw an inference of guilt from the circumstances of flight from the crime scene.   *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007).   When appellant was arrested for the murder, he gave law-enforcement authorities a false name.   Giving a false name to law-enforcement officers indicates a consciousness of guilt.   *Hargrove v. State*, 211 S.W.3d 379, 387 (Tex. App.—San Antonio 2006, pet. ref'd).   In conducting a review of the evidence admitted at trial, we find the evidence against appellant was substantial.

### b. The Character of the Alleged Error and How It Might Be Considered in Connection with Other Evidence in the Case

The crayon drawing was recovered from Vasquez's clothing at the time of his autopsy.   The identity of the person who made the drawing is unknown, and it contains no information, either linking appellant to, or exculpating him from, Vasquez's murder.   While the drawing was irrelevant, it was not so emotionally charged that it prevented the jury from rationally considering the evidence before it.

### c. State's Emphasis of the Error

During the State's rebuttal closing argument at guilt-innocence, the prosecutor argued to the jury:

Prosecutor:       Ladies and gentlemen, there is one person—my heart sunk—

Defense Counsel:   I'm going to object to—that goes against the Court's

---

[10] Alvaro Rivera never testified that appellant told him he killed Vasquez in self defense.

> ruling about asking for sympathy and showing a
> picture.

>    The Court:          It's part of the evidence.

>    Defense Counsel:    I know, Judge, but it's improper argument—to be
>                        asking for sympathy or—

The trial court overruled the objection and stated, "It's part of the evidence."   After the

trial court stated this, defense counsel stated, "For the record, Judge, he [the prosecutor]

is showing a crayon picture that looks like it's done by a child."   The trial court once again

overruled the objection.   Defense counsel did not request a running objection.

Afterwards, the prosecutor argued to the jury:

> The family needs justice.   This man didn't deserve this.   This is someone
> [the person who made the crayon drawing] that won't get to see this person
> [Juan Vasquez].   I need fairness.   Yes, I want you to be fair to this
> Defendant.   I do.   I really do.   And I want you to be fair to this victim and to
> their family.   Thank you.

Defense counsel did not object to this argument.   When a defendant fails to object

to jury argument, he forfeits his right to raise the issue on appeal, even if the issue is

constitutional in nature.   *Threadgill v. State*, 146 S.W.3d 654, 670 (Tex. Crim. App.

2004); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).   Therefore,

appellant waived any error in this portion of closing argument.

Nevertheless, we can tell from the objected-to portion of the argument that the

intended purpose for admitting the crayon drawing was to evoke the jury's sympathy and

therefore constituted improper argument.   *See Alejandro v. State*, 493 S.W.2d 230, 231

(Tex. Crim. App. 1973) (stating that proper jury argument must fall within one of four

categories:   (1) "summary of the evidence;" (2) "reasonable deduction from the

20

evidence;" (3) "answer to argument of opposing counsel;" and (4) "plea for law enforcement.").

### d. Jury Instructions

The court's guilt-innocence charge stated, in relevant part, "Do not let bias, prejudice, or sympathy play any part in your deliberations." Nothing in the record shows that the jury did not follow this instruction. The jury is presumed to follow the instructions given in the court's charge. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996).

Once the evidence is fully considered, along with the other relevant factors, we conclude that the error was harmless. We have fair assurance that the error did not influence the jury or had but a slight effect. Issue three is overruled.

### D. Closing Argument

In issue four, appellant argues the trial court erred in allowing at least two forms of improper jury argument.

### 1. Applicable Law

In *Alejandro v. State*, the court of criminal appeals stated that "[i]t is the duty of trial counsel to confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is therefore improper." *Alejandro*, 493 S.W.2d at 231. "Thus, proper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence: (3) answer to argument of opposing counsel; and (4) plea for law enforcement." *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008). "'The arguments that go beyond these areas

21

too often place before the jury unsworn, and most times believable testimony of the attorney.'" *Id.* (quoting *Alejandro*, 493 S.W.2d at 231).  "Consequently, error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper."  *Id.* (citing *Allridge v. State*, 762 S.W.2d 146, 155 (Tex. Crim. App. 1988)).

### 2. Analysis

Appellant calls our attention to various portions of the State's closing argument at guilt-innocence.   In the first instance, the prosecutor argued:

> I started my opening argument with a Bible verse.   And the reason for that is because I've been doing that for almost nine years now because I believe it.   I believe in God's word.   And there is a verse in the Bible that says do not be deceived, God shall not be mocked and whatever a man sows that is what he shall reap. . . .   What is the truth?   I know what the truth is in my heart but you will tell us what the truth is. . . .
>
> You can come up with a lot of these excuses or rabbit trails and you can chase these as much as you want to, ladies and gentlemen, but the truth of the matter is that there is only one truth here.   It's that this man [appellant] right here, a heartless man, took the life of Juan Vasquez. . . .

Defense counsel did not object to these complained-of remarks.   Therefore, appellant waived any error in this portion of closing argument.  *See Threadgile*, 146 S.W.3d at 670; *Cockrell*, 933 S.W.2d at 89.

In the second instance, the prosecutor, after discussing the testimony of some of the State's witnesses, argued:

> Now, you could say, well—you know, some things they couldn't remember and some things—ladies and gentlemen, it [the incident in question] was in 2003 but I can tell you that I was impressed with this testimony.   I'm doing this—I was impressed with the consistency that I heard from this family.

22

At that point, defense counsel objected to the prosecutor "making personal opinions about the credibility of a witness." The trial court overruled the objection but instructed the jury, "Ladies and gentlemen, you heard the facts and the evidence that has been presented. What the attorneys argue and tell you is not evidence."

"[I]t is ordinarily improper for a prosecutor to vouch for the credibility of a witness during his argument." *Chapman v. State*, 503 S.W.2d 237, 238 (Tex. Crim. App. 1974); *Sanders v. State*, 191 S.W.3d 272, 275 (Tex. App.—Waco 2006, pet. ref'd). Thus, the prosecutor's comments constituted an improper comment on the credibility of the State's witnesses. The error warrants reversal if appellant's substantial rights were affected. *See Brown*, 270 S.W.3d at 572 (providing that improper argument is nonconstitutional in nature); *Mosely v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (holding that improper jury arguments are nonconstitutional violations analyzed pursuant to rule 44.2(b) of the Texas Rules of Appellate Procedure). To determine whether the State's improper argument affected appellant's substantial rights, "we balance the severity of the misconduct (*i.e.*, the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct." *Brown*, 270 S.W.3d at 573.

> [I]n evaluating the severity of the misconduct, we must assess whether [the] jury argument is extreme or manifestly improper [by] look[ing] at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive [appellant] of a fair and impartial trial.

*Id.* at 573 (internal quotation marks omitted).

In examining the severity of the remarks, we note that after the trial court's curative measure, the prosecutor told the jury, "Let me remind you that what I say is not evidence."

"Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm, and can, in the appropriate circumstances, render an improper comment harmless." *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004). Consequently, the severity of the misconduct was mild. After reviewing the entire record of the State's final argument, we conclude that there was no willful or calculated effort to deprive appellant of a fair and impartial trial.

Furthermore, the trial court made a curative measure by sua sponte telling the jury "you heard the facts and the evidence that has been presented. What the attorneys argue and tell you is not evidence." Finally, the certainty of conviction was high, absent the improper comments. At trial, in addition to the Rivera family's testimony, a shotgun and revolver were found in the laundry room, which was accessible from the carport that separated Anaya's home from the home where appellant stayed. This corroborated the testimony that appellant arrived at the house with a shotgun and a .22 pistol. Forensic testimony showed that the shotgun, which was found in the laundry room, was the weapon that killed Vasquez. After the murder and the incident where appellant pointed a weapon at the three Rivera brothers, appellant fled the area. When he was arrested, he gave authorities a false name. This is circumstantial evidence of guilt that corroborated the testimony of the Rivera family members. Therefore, after reviewing the entire record and final arguments, as a whole, and balancing the appropriate factors, we have fair assurance that the error did not influence the jury, or had but a slight effect.

24

Next, appellant complains about another incident during closing argument when the prosecutor showed the crayon drawing to the jury and commented:

Ladies and gentlemen, there is one person—my heart sunk—

\*   \*   \*

The family needs justice. This man didn't deserve this. This is someone that won't get to see this person [Juan Vasquez]. I need fairness. Yes, I want you to be fair to the Defendant. I do. I really do. . . .

Even though appellant did not object to the latter portion of this argument, the record shows that the prosecutor was trying to evoke the jury's emotions and sympathy. Thus, the argument was improper. *See Brown*, 270 S.W.3d at 570. In examining the severity of the remarks, we note that the prosecutor made reference to the crayon drawing only once during closing argument. Consequently, the severity of the misconduct was mild. After reviewing the entire record of the State's final argument, we conclude that there was no willful or calculated effort to deprive appellant of a fair and impartial trial.

Even though the trial court did not instruct the jury to disregard either the crayon drawing or the prosecutor's plea for sympathy, the court's charge stated: "Do not let bias, prejudice, or sympathy play any part in your deliberations." Moreover, the certainty of conviction was high, absent the prosecutor's improper comments and use of the crayon drawing. Therefore, after reviewing the entire record and final arguments, as a whole, and balancing the appropriate factors, we have fair assurance that the error did not influence the jury, or had but a slight effect. Issue four is overruled.

**E. Cumulative Error**

In issue five, appellant argues the number of errors had a cumulative, harmful effect. The court of criminal appeals has stated that "[i]t is conceivable that a number of errors may be found harmful in their cumulative effect." *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

Appellant reiterates the arguments he made in his first four issues. With respect to issue one—the motion to suppress—and issue two—the alleged improper impeachment of Maria Maldonado, we have previously held that the trial court did not abuse its discretion by denying the motion to suppress and that error, if any, was waived regarding Maldonado's alleged improper impeachment. These non-errors cannot comprise cumulative error. *See id.* (stating "we are aware of no authority holding that non-errors may in their cumulative effect cause error.").

Regarding the errors discussed in issues three and four, we conclude the cumulative effect of those errors was not harmful. In *Stahl v. State*, the defendant was charged with murder. 749 S.W.2d 826, 826 (Tex. Crim. App. 1988) (op. on reh'g). During the guilt-innocence stage, the prosecutor, for the purpose of identifying the victim, called the victim's mother to the witness stand and showed her a full-faced morgue photo of her son, the victim. *Id.* at 828. Upon seeing the photo, she said, in the jury's presence, "Oh, my God. . . . Oh, my God. My baby. My God. . . . May he rest in hell. May he burn in hell. Oh, my baby." *Id.* The trial court instructed the jury "to disregard the outburst." *Id.* The court of criminal appeals noted that "once the event [the outburst] happened, the prosecutor sought to exacerbate its impact to the jury . . . in his closing

26

argument at the 'guilt' stage." *Id.* at 830. The court stated that the prosecutor's "persistent appeals in the face of adverse rulings speak loudly of the prosecutor's desire to use the outburst for inflammatory purposes." *Id.* The court reversed the defendant's murder conviction and stated, "The factors suggesting harm lie in the cumulative effect of the outburst and the improper arguments." *Id.* at 832. The court further stated that "such appeals to abandon reason are improper. They distract the jury from the actual evidence of whether or not the defendant committed the crime of which he is accused." *Id.* (internal quotation marks omitted).

In the instant case, the trial court erred in (1) admitting the crayon drawing and in (2) overruling defense counsel's objection when the prosecutor, during closing argument, showed it to the jury, making a plea for sympathy, and (3) overruling defense counsel's objection to the prosecutor's remarks about the credibility of the State's witnesses. However, the facts in *Stahl* are distinguishable from those in the instant case. Here, the crayon drawing did not evoke any reaction, much less an outburst, from any witness, and it is far less inflammatory when compared to a full-faced morgue photo of a murder victim. Rather than making "persistent appeals" to the jury, the prosecutor in the case before us only called the jury's attention to the crayon drawing on one occasion during closing argument. After considering the cumulative effect of these errors, we conclude that the errors were harmless. We have a fair assurance that the errors did not influence the jury or had just a slight effect.

As part of his fifth issue, appellant argues the trial court erred by sua sponte resetting the punishment hearing in order to give the State additional time to provide

sufficient notice of a prior robbery conviction. However, appellant has cited no authority to support this argument. Therefore, this contention is inadequately briefed and presents nothing for review. *See* TEX. R. APP. P. 38.1 (i); *Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000) (stating that failure to cite relevant authority waives error). Issue five is overruled.

### III. CONCLUSION

We affirm the trial court's judgments.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
20th day of October, 2011.